# **EXHIBIT 2**



**BOARD OF APPEALS**
TOWN OF HEMPSTEAD
1 Washington Street
Hempstead, New York 11550-4923
(516) 489-5000
FAX (516) 483-0432
WWW.TOH.LI

# NOTICE OF DECISION

January 27, 2011

Tracking Number: 201001428

Case Number:     682/10

Hearing Date:    8/18/2010

Decision Date:   1/26/2011

TO:
T-Mobile Northeast, LLC.
3500 Sunrise Hwy., Ste. D203
Great River, NY  11739

REQUEST:   Install nine (9) wireless communication antennas & equipment cabinets all concealed behind screening, all on roof of existing building.

LOCATION:   E/s Nassau Blvd., 48.27' S/o Cambridge Ave., a/k/a 3 Nassau Blvd., NR GARDEN CITY

DECISION:   DENIED with Findings (see attached).

Very truly yours,

*Joseph F. Pellegrini*

Joseph F. Pellegrini
Secretary to Board of Appeals

January 26, 2011

**Case # 682 – T-Mobile Northeast LLC**
(Department of Buildings # 201001428)

FIRST: The application herein concerns a parcel of land on the east side of Nassau Blvd., 48.27' south of Cambridge Ave., with a frontage of 26.31' on the east side of Nassau Blvd. and depth ranging from 90.8' to 100'.

SECOND: The parcel is entirely within a Business district that runs along both sides of Nassau Blvd. and is improved with a two-story building. The structure is what was commonly known as a "taxpayer" – business use on the first floor and residential apartment use on the second floor.

THIRD: The subject parcel, as do all the business zoned parcels within the 200' radius on the east side of Nassau Blvd. abut Res. "B" zoned land improved with single family dwellings.

FOURTH: Applicant proposes to install nine (9) wireless communication antennas and equipment on the roof of the subject building. The equipment will be placed on a 20' x 11' platform, with equipment at a height of approximately 30'7". A "transparent screen" as described on applicant's plans, to match the façade of the building will completely enclose the roof. The result will be a "3rd story" over the existing "taxpayer".

FIFTH: At the public hearing, the Board requested counsel for applicant and the opposition to submit proposed findings that this Board should adopt.

SIXTH: The Board has reviewed the "Findings of Fact" submitted and determines that the Findings of Fact as submitted by counsel for the opposition, Andrew J. Campanelli, meet the requirements of the law and will be adopted by this Board.

On motion of Mr. Browne and seconded by Mr. Ragano, the Board finds:

I Based upon the admissions of its own expert, the Applicant has failed to establish FCC compliance with respect to inhabitants within and around the building upon which the intended facilities are to be installed.

At the public hearing of December 8, 2010, the applicant produced Kevin McManus, from the firm EBI, who prepared the radio frequency antenna site FCC compliance report which was submitted to the Board in support of the application.

In explaining the FCC requirements applicable to the instant application, Mr. McManus pronounced

> "The requirement is we need to demonstrate compliance for anyone who might be at or around, adjacent to the antennas" Transcript p192.

In response to an inquiry from Chairman Weiss:

"How close is the closest residence to the site" Transcript p194.

Mr. McManus replied:

"Approximately 80 feet to the east of the site" Transcript p194.

Mr. McManus proceeded to explain that he did an evaluation at 80 feet. Transcript p194

As Mr. McManus conceded, he prepared his report based upon the *occupational limit*, as opposed to the more stringent *general population* limit, predicated upon his belief that "access to the rooftop would be controlled" and his belief that the closest residence was eighty (80) feet away. Transcript p196-197.

As Mr. McManus additionally conceded that at a mere one foot distance from the antennas, the RF emissions emanating from the antennas would exceed the maximum FCC permissible *general population limit* by six (600%) hundred to seven (700%) hundred percent, again asserting that the less stringent occupational limit should apply, based upon a claim that "the rooftop is a controlled environment," and concomitantly, the nearest residence (Mr. McManus claimed) was eighty feet (80) away. Transcript p 200-201.

When inquiry was made with regard to preparation of the applicant's modeling report for FCC compliance, Mr. McManus made it abundantly clear that the modeling report did not take into account, the tenants and apartments immediately below the intended installation, which would be separated from the antennas by nothing more than a flat roof.

As addressed on the record during Mr. Campanelli's questioning of Mr. McManus:

> Q: "You testified that you believed the closest residence was 80 feet away. What did you base that on?"
>
> A: "Review of the site drawings and the site visit that I provided." Transcript p 203.

> Q: "When you calculated your belief 80 feet was the distance from the facility to the closest residence you didn't take into account there were two apartments just below, on the second story just below the roof?"
>
> A: "I did not have that information."
>
> Transcript p 207.

In the sworn testimony provided by Eugenia Verdis and Patrick Corcoran, there are several apartments located on the second floor of the building, at least one of which is occupied by a family with multiple children. Transcript p 328

As sworn to by Patrick Corcoran:

> "This is on top of an apartment complex. There are apartments and buildings adjacent. There is a patio in the back. Any summer night there is 20, 30 Adelphi students having a party. If there is a fire they have two ways of getting off, one is down a narrow staircase, or they can jump off the patio in the back on the second floor and land on concrete, fence, whatever is down there."
>
> Transcript p 345-346.

"I have been living there for 20 years. It's not 80 feet to the nearest residence. Joe's backyard is like eight and-a-half feet, whatever it is." Transcript p 347.

While Mr. McManus posited to the Board that the less stringent "occupational limit" set by the FCC for RF emissions should apply (premised upon the theory that the roof would be a "controlled environment"), the second floor apartments immediately below the antennas, separated only by a roof, and the second story patio collectively, which were concededly *not considered* by Mr. McManus, are *not* a controlled environment, and the applicant has failed to address, much less establish, why the more stringent FCC general population limit does not apply. Nor has the applicant even suggested that the applicant *could* meet the more stringent standard, despite having conceded that, at a distance of one foot from the antennas, they would exceed that FCC general population limit by 600% to 700% percent.

47 CFR §2.1 dictates that the less stringent, *occupational limit* applies as follows:

> "Occupational/controlled exposure. For FCC purposes, applies to human exposure to RF fields when persons are exposed as a consequence of their employment and in which those persons who are exposed have been made fully aware of the potential for exposure and can exercise control over their exposure.

Occupational/controlled exposure limits also apply where exposure is of a transient nature as a result of incidental passage through a location where exposure levels may be above general population/uncontrolled limits, as long as the exposed person has been made fully aware of the potential for exposure and can exercise control over his or her exposure by leaving the area by some other appropriate means."

As is self-evident, the family and other applicants residing in the apartment immediately below the proposed antenna installation, separated only by a flat roof, do not fall within the category of persons who would be exposed as a result of their employment. Nor can it be said that their exposure, within their home, would be "transient in nature." In similar vein, the 20 or 30 Adelphi students who might regularly attend evening gatherings on the second story deck would not fall within the category preserved for occupational exposures, nor could they be expected to have been made fully aware of their potential for exposure, especially in light of the applicants stated intent to employ efforts to conceal the antennas from view.

By contrast, 47 CFR§ 2.1 dictates that the more stringent *general population* limit applies as follows:

"General population/uncontrolled exposure. For FCC purposes, applies to human exposure to RF fields when the general public is exposed or in which persons who are exposed as a consequence of their employment may not be made fully aware of the potential for exposure or cannot exercise control over their exposure. Therefore, members of the general public always fall under this category when exposure is not employment-related."

It is beyond debate, in the Board's view, that the tenants within the apartments immediately below the proposed installation site, the students and/or members of the public who attend functions on the second story patio, and the other residents who live less than 80 feet from the site fall within the category for general population exposure, notwithstanding the application's assertions that physical access to the roof, itself, would be restricted.

Even if the Board were to ignore the spectre of the lack of credibility on the part of the applicant's FCC compliance expert, who testified that based upon his physical inspection of the premises, the closest residence was 80 feet away, when, in fact, there are multiple apartments immediately below the proposed site separated only by a flat roof, and additional residents

situated less than the claimed 80 feet, the fact remains that the expert has failed to establish to any degree, that the intended equipment would meet the FCC standards for RF exposure.

While conceding that, at one foot from the antennas, the RF emissions would exceed the general population RF limit by 600% to 700%, he asserted that at a combined distance of five feet away, and eight feet down, the RF emissions would drop by ninety six (96%) percent. Transcript p 201-203.

Even if the Board were to accept that as true, neither Mr. McManus' testimony, nor his report, addresses the RF level to which the tenants in the apartment immediately below the antennas would be exposed, at a distance which could be substantially less than what Mr. McManus addresses, assuming that the apartment immediately below the proposed antennas has a standard 7 foot ceiling, and any adults residing within the apartment would be of average height, potentially placing them a distance of less than 8 feet from the antennas.

Since, the applicant (a) has failed to establish that the wireless facility would be FCC compliant, (b) has acknowledged that it has failed to consider known conditions which, under FCC regulations, they would be required to consider to determine whether the applicable FCC RF limitation would be the general population limit or the occupational limit, and (c) has failed to establish that the equipment would be compliant with FCC permitted levels for general population under 47CFR §2.1, the application is denied.

II   The applicant has failed, entirely, to submit evidence by anyone with personal knowledge of any factual basis to establish that they possess a gap in coverage.

In an effort to establish that the applicant suffers from a gap in coverage, and concomitantly, that the granting of its application is necessary to address same, the application proffered testimony and reports prepared by Lydia Trujillo, who was presented to the Board as T-Mobile's radio frequency engineer. Transcript p 257.

Void entirely from the applicant's presentation, however, was fulfillment of the most basic of element of presenting a zoning application before the Board.

Simply stated, the applicant failed to present a single witness to provide any personal or first-hand testimony of the factual allegations upon which the applicant's expert proffered her conclusions, as clearly reflected within the following testimony of the applicant's expert:

EXAMINATION OF LYDIA TRUJILLO BY ANDREW CAMPANELLI:

Q: "Exhibit 17, ma'am, I think you testified that the data which was used to compile that exhibit was not prepared by you; is that correct?"

A: "I beg your pardon. What do you mean by that Mr. Campanelli?"

Q: "Exhibit 17."

A: "That's the test drive data.

What do you mean it wasn't prepared by me?"

Q: "Where did you get the data from?"

A "T-Mobile hires a company.

They go and do a comprehensive drive

throughout the whole U.S. and they provide me the data."

Q: "You didn't compile that data?"

A: "I compiled this data with this map."

Q: "You were not the original source of the data.

You took the data prepared by a third party; is that correct?"

A: "Yes."

Q: "You don't know who did the drive-by?"

A: "What?"

Q: "You don't know who it is that did the drive-by?"

A: "I have the name of the person that did the drive, along with a 90-page document that shows the drive in detail."

Q: "Are they here tonight?"

A: "No."

Transcript p 305-308.

Despite having had more than ample opportunity to do so, the applicant failed to proffer one iota of sworn testimony from a single witness to even assert, much less establish, any factual basis that (a) the applicant suffers from specific gaps in coverage, (b) the antennas which are the subject of this application would remedy said gaps in coverage, and (c) the extent to which they would achieve such objective.

Nothing that Ms. Trujillo proffered, in the form of any sworn statements, via testimony or otherwise, nor any of her reports, were supported by any shred of evidence of the underlying facts upon which she drew all of her conclusions.

Contrary to what is routinely done by applicants in the industry who present applications to install cell antennas before zoning boards, the applicant has failed to produce a single witness to testify that they had personally performed any actual testing which reflected that the applicant suffered from a gap in coverage.

As such the application must be denied.

SEVENTH: The Board, in addition to the findings of Fact submitted by opposition counsel and adopted by the Board further finds:

The proposed 3rd story enclosure is completely out of character with the community development and will stand out as a "sore thumb" in this community and have an adverse aesthetic effect.

The Board further determines:

(1) The use will prevent the orderly and reasonable use of adjacent properties or of properties in adjacent use districts;

(2) The use will prevent the orderly and reasonable use of permitted or legally established uses in the district wherein the proposed use is to be located or of permitted or legally established uses in adjacent use districts;

(3) The safety, the health, the welfare, the comfort, the convenience or the order of the Town will be adversely affected by the proposed use and its location; and

(4) The use will not be in harmony with and promote the general purposes and intent of this ordinance.

## DECISION

On motion of Mrs. D'Amato and seconded by Mr. Browne, Denied.

The foregoing resolution was adopted upon roll call as follows:

AYES: Mr. Weiss
Mrs. D'Amato
Mr. Browne
Mr. Mistero
Mr. Ragano

NOES: None

Mr. Wright not voting or participating.